JOHN E. McCARTHY & others *vs.* SHERIFF OF SUFFOLK
COUNTY & others
(and two companion cases[1]).

Suffolk.    November 7, 1974. — February 6, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Public Officer.   Retirement.   Contract,* What constitutes, Retire-
-ment.   *Constitutional Law,* Obligation of contracts, Due process of
law, Equal protection of laws, Retirement.

Inasmuch as court officers have no vested right to remain employed in
their positions until age seventy, an amendment to c. 221, § 72,
reducing the mandatory retirement age for court officers from seventy
to sixty-five, did not violate due process even as applied to the
plaintiffs who had been appointed, and had reached age sixty-five,
before its enactment. [781-785]
Inasmuch as the contractual rights of members of the State employees
retirement system under G. L. c. 32, § 25 (5), are limited to pension
security, and do not guarantee job security, an amendment to c. 221,
§ 72, reducing the mandatory retirement age for court officers from
seventy to sixty-five, did not unconstitutionally impair any obliga-
tion of contract, even as applied to the plaintiffs, who had been
appointed, and had reached age sixty-five, before its enact-
ment. [785]
A statute establishing a retirement age for court officers lower than that
for government employees generally did not deprive the officers of
equal protection of laws. [786-787]

THREE BILLS IN EQUITY filed in the Superior Court on
August 29, 1972, September 1, 1972, and September 12,
1972.

The suits were reported by *Good, J.*

*Wilson D. Rogers, Jr. (Charles J. Dunn* with him) for the
plaintiffs.

*Mack K. Greenberg,* Assistant Corporation Counsel
(*Herbert P. Gleason,* Corporation Counsel, with him) for
the Sheriff of Suffolk County & others.

---

[1] The companion cases are: Willis A. Smith & others *vs.* Sheriff of Norfolk
County & others and Joseph E. Duffy & others *vs.* Sheriff of Middlesex County &
others.

*Michael Eby*, Deputy Assistant Attorney General (*Terence P. O'Malley*, Assistant Attorney General, with him) for the Attorney General.

TAURO, C.J.   The plaintiffs, court officers appointed pursuant to G. L. c. 221, §§ 69, 70, and 72, to attend sessions of the Superior and Supreme Judicial courts, filed a bill of complaint for declaratory and injunctive relief, alleging that St. 1972, c. 740, § 10, amending c. 221, § 72, which reduces the mandatory retirement age for court officers from seventy to sixty-five, is unconstitutional if applied to them. Similar bills were filed on behalf of named plaintiffs in Norfolk and Middlesex counties[2] and were consolidated for trial in Suffolk county, where, after consideration, the trial judge reported all the cases to the Appeals Court. We allowed the plaintiffs' application for direct appellate review, and these cases are now before us pursuant to S.J.C. Rule 3:24, § 4, 359 Mass. 834, and fn. thereon, and 835 (1972).

The relevant facts, as set forth in the statement of agreed facts, are briefly as follows: The plaintiffs are all court officers appointed prior to August 16, 1972, the effective date of the amendment.[3] All except the plaintiffs Sweeney and Howell[4] are members of the State employees' retirement system and all are classified in Group 1. G. L. c. 32, § 3 (2) (g). Prior to the 1972 amendment, G. L. c. 221, § 72, provided that court officers were to be appointed to hold office during good behavior and were removable for cause. The employment of those court officers who are members of the retirement system had been modified to the extent that they were required to retire at age seventy, in accordance

---

[2] By leave of court, the plaintiffs' bill in the McCarthy case was amended so that the named plaintiffs are bringing this suit in their own behalf and as representatives of all other court officers in the Commonwealth who have a common interest in the subject matter of the suit.

[3] As part of a statute relating to the creation of a court, the amendment became effective thirty days after passage. See G. L. c. 4, § 1; art. 48, The Initiative, II, § 2, of the Amendments to the Massachusetts Constitution.

[4] John J. Howell died on December 6, 1972.

with the requirements for members of Group 1. G. L. c. 32, § 1, "Maximum Age."

All the named plaintiffs have attained the age of sixty-five. All will be retired immediately if the amendment lowering the retirement age is found to be applicable to them. The plaintiffs bring these suits to enjoin the defendants from interfering with their employment as court officers and for a declaration that St. 1972, c. 740, § 10, does not apply to them. We hold that the amendment is applicable to all the plaintiffs, and, as applied, does not contravene either the United States or the Massachusetts Constitutions.

The plaintiffs treat these cases as revolving around the question of retroactivity; first, whether the Legislature intended the statute to operate retroactively, and second, whether such retroactive operation would be constitutional. They assume that application of the amendment to presently employed court officers makes it retroactive, and then argue that such retroactivity would contravene the United States and Massachusetts Constitutions. There is a major fallacy in this analysis. The fact that a nonprocedural statute applies to the plaintiffs does not, in and of itself, make that statute retroactive. Neither does the fact that it draws on antecedent facts for its operation. *Cox* v. *Hart,* 260 U. S. 427, 435 (1922). *Lewis* v. *Fidelity & Deposit Co.* 292 U. S. 559, 571 (1934). In order to determine whether a statute is retroactive, it is necessary to look at the rights and obligations of the parties as they existed immediately before and after the effective date thereof. It is only where vested substantive rights of the parties have been adversely affected that we can say a statute operates retroactively, and it is only then that we need analyze the nature of the governmental interest involved in order to determine whether the statute, as applied, violates due process. Cf. *Bernhardt* v. *Atlantic Fin. Corp.* 311 Mass. 183, 190-191 (1942).

We turn then to an examination of the rights of the plaintiffs immediately before and after the amending legislation. The plaintiffs contend that they possessed

contractual rights in their pension[5] benefits, pursuant to G. L. c. 32, § 25 (5).[6] As to this point, there is no dispute. *Opinion of the Justices,* 364 Mass. 847, 856-863 (1973). The controversy exists in defining the nature and extent of the rights created by § 25 (5) in order to determine whether those rights have been impaired by St. 1972, c. 740, § 10.

It is well settled that, where an office is created by the Legislature and not by the Constitution, "[I]t may be regulated, limited, enlarged or terminated by law, as public exigency or policy may require." *Taft* v. *Adams,* 3 Gray 126, 130 (1855). Accord, *Butler* v. *Pennsylvania,* 10 How. 402, 416 (1850); *Barnes* v. *Mayor of Chicopee,* 213 Mass. 1, 4 (1912); *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 480 (1921); *Williams* v. *New Bedford,* 303 Mass. 213, 214-215 (1939). See *Nichols* v. *Commissioner of Pub. Welfare,* 311 Mass. 125, 130 (1942); *Commissioner of Admn.* v. *Kelley,* 351 Mass. 686, 691 (1967). Cf. *McNeil* v. *Mayor & City Council of Peabody,* 297 Mass. 499 (1937). See also *Kingston* v. *McLaughlin,* 359 F. Supp. 25 (D. Mass. 1972), affd. 411 U. S. 923 (1973). The Legislature is free to alter the methods for appointment and removal of State officers, as well as to change their duties or tenure. *Collins* v. *Selectmen of Brookline,* 325 Mass. 562, 565 (1950). The fact that an officer is appointed during "good behavior," removable for cause, does not alter this result. *Donaghy* v. *Macy,* 167 Mass. 178 (1896). Thus, the plaintiffs here had no contractual rights to continued government employment.

---

[5] For purposes of these cases, the word "pension" is used throughout in a general sense to indicate those benefits payable to a government employee upon and after retirement. No attempt is made to differentiate between payments derived from employee contributions and those from the governmental unit.

[6] General Laws c. 32, § 25 (5), as amended by St. 1956, c. 525, reads: "The provisions of sections one to twenty-eight, inclusive, and of corresponding provisions of earlier laws shall be deemed to establish and to have established membership in the retirement system as a contractual relationship under which members who are or may be retired for superannuation are entitled to contractual rights and benefits, and no amendments or alterations shall be made that will deprive any such member or any group of such members of their pension rights or benefits provided for thereunder, if such member or members have paid the stipulated contributions specified in said sections or corresponding provisions of earlier laws."

The plaintiffs argue, however, that G. L. c. 32, § 25 (5), changes this long-standing rule as to them, because it prevents the Legislature from taking any action which would impair the pension rights and benefits of members of the State retirement system. They contend that c. 740, § 10, which lowers the mandatory retirement age for court officers from seventy to sixty-five, adversely affects the pension benefits payable on retirement,[7] and thus violates their contract with the Commonwealth, in contravention of both the United States and Massachusetts Constitutions.[8] We disagree.

In our recent *Opinion of the Justices,* 364 Mass. 847 (1973), we examined the legislative history of § 25 (5) in order to determine the scope of the contractual rights created by that section. We held that, at a minimum, § 25 (5) creates a contractual relationship wherein members of the system are entitled to have the level of rights and benefits in force when they became members preserved substantially in their favor without modification downward. *Id.* at 860. In characterizing the nature of the contractual rights created, we stated that they are "best understood as meaning that the retirement scheme has

---

[7] In order to understand the thrust of this argument, it is necessary to explain briefly the operation of the retirement system as it relates to the plaintiffs. The benefits paid pursuant to this system are determined as a percentage of yearly compensation. This percentage is calculated by multiplying the number of years as a member of the retirement system by two and one-half per cent, up to a maximum of eighty per cent (thirty-two years). This percentage is then applied to the annual compensation for the best three consecutive years or last three years of creditable service, whichever is greater. Thus, for each additional year worked up to thirty-two, a member receives an additional two and one-half per cent of salary yearly.

The plaintiffs in these cases fall into three classes: those who already have thirty-two years of creditable service, those with less than thirty-two years' service, but who will reach the maximum if allowed to work until age seventy, and those who are below thirty-two years and who cannot reach maximum even if allowed to work until age seventy. As to the latter two classes, employment until age seventy will increase their applicable percentage, and thus will clearly affect the pension benefits they will receive. With regard to those in the first class, their benefits will be affected by early retirement only if there are salary increases until they attain age seventy. They cannot earn a higher percentage, but they can attain a higher salary base upon which to apply their eighty per cent multiplier.

[8] This argument is not applicable to the plaintiff Sweeney, who is not a member of the State retirement system. As to him, the holding above disposes of the case.

generated material expectations on the part of employees and those expectations should in substance be respected." *Id.* at 861. We went on to say that members of the plan should be protected in the core of their reasonable expectations. *Ibid.* The key to the contractual relationship established by § 25 (5), then, is those material expectations which can reasonably be said to affect an employee's decision to accept, and stay employed in, a position with the Commonwealth. See, generally, Cohn, Public Employee Retirement Plans — The Nature of the Employees' Rights, 1968 U. of Ill. L. Forum 32. See also 1955 House Doc. No. 2500, pp. 105-108 (minority report). We cannot say that the plaintiffs, in accepting employment with the Commonwealth and in joining the retirement plan, could have had a reasonable expectation that they would be guaranteed employment as court officers until age seventy, considering the extensive power of the Legislature to change, or in fact to do away with, their positions.

We reject the plaintiffs' argument that, in enacting § 25 (5), the Legislature intended to provide them with a guaranteed job until age seventy. There is nothing in the legislative history of that section to support this contention. See 1955 House Doc. No. 2500, pp. 40-41, 105-108 (minority report). We may presume that the Legislature was aware of its power to fix and change the tenure of public officers. Cf. *Selectmen of Topsfield* v. *State Racing Commn.* 324 Mass. 309, 313 (1949); *Condon* v. *Haitsma,* 325 Mass. 371, 373 (1950). There is no indication that, in enacting § 25 (5), it intended impliedly to do away with that power. *Pineo* v. *White,* 320 Mass. 487, 491 (1946). Accordingly, we hold that § 25 (5) was intended to create pension security, not job security, and that the plaintiffs have no vested contractual rights to continuation in office.[9]

Our conclusion that the plaintiffs have no vested right to remain employed as court officers until age seventy dis-

---

[9] This holding is bolstered by the fact that the law existing at the time a contract is made is read into that contract. *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 429-430 (1934). Thus, when the Commonwealth created contractual rights in the plaintiffs' pension benefits, these rights were created subject to the reserved power of the Legislature to alter their terms of office.

poses of their due process contentions. The due process clause protects only those interests which are encompassed in the Fourteenth Amendment's protection of liberty and property. *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 569-570 (1972). We have decided that the plaintiffs' interest in continued employment cannot be characterized as a contractual right. It is a mere "expectancy." Such expectancies are not protected by the due process clause of the United States Constitution nor by the Massachusetts Declaration of Rights. Cf. the *Roth* case, 408 U. S. at 577 (1972). Accordingly, the amendment, as applied to the plaintiffs, is not violative of due process.

Similarly, we reject the plaintiffs' contention that application of the amendment to them constitutes an unconstitutional impairment of contract. The plaintiffs correctly state that "where this court is called upon . . . to decide whether state legislation impairs the obligation of a contract, we are required to determine . . . these questions: (1) Was there a contract? (2) If so, what obligation arose from it? and (3) Has that obligation been impaired by subsequent legislation?" *Detroit United Ry.* v. *Michigan,* 242 U. S. 238, 249 (1916). Accord, *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. at 429 (1934). They contend, again correctly, that § 25 (5) creates a contract between them and the Commonwealth. *Opinion of the Justices,* 364 Mass. 847, 856-859 (1973). The next step in their reasoning, however, that the obligation involved is "to permit . . . [them] to work until age 70," is incorrect. As we stated above, no such obligation was intended, nor was such created, by enactment of § 25 (5). Accordingly, no contractual obligations will be impaired by application of c. 740, § 10, to the plaintiffs, and such application will not violate either the Massachusetts or the Federal Constitution. Cf. *Reynolds* v. *Commissioner of Commerce & Dev.* 350 Mass. 193, 194 (1966), cert. den. 384 U. S. 1001 (1966).[10]

---

[10] This result is consistent with that reached in New York in a case arising under the New York constitutional provision on which our statutory provision is based. See 1955 House Doc. No. 2500, pp. 105-108 (minority report). See also *Opinion of*

Finally, the plaintiffs argue that they will be deprived of equal protection of the laws if c. 740, § 10, is applied to them. They argue that G. L. c. 32, § 3 (2) (g), created four classes of government employees, and that the amendment to c. 221, § 72, creates a new class within Group 1, in violation of their rights to equal protection.

It is well settled that "a State retains broad discretion to classify as long as its classification has a reasonable basis." *Graham* v. *Richardson,* 403 U. S. 365, 371 (1971), citing *Lindsley* v. *Natural Carbonic Gas Co.* 220 U. S. 61, 78 (1911). *Williamson* v. *Lee Optical of Okla. Inc.* 348 U. S. 483, 489 (1955). *Morey* v. *Doud,* 354 U. S. 457, 465 (1967). *McGowan* v. *Maryland,* 366 U. S. 420, 425-427 (1961). Although neither party has introduced evidence to show the rationality vel non of this classification, on the face of the statute,[11] we can conclude that the amendment is reasonable.

Examination of the various groups established by the statute discloses a legislative intent to provide for earlier retirement of those government officers concerned with the safety of the public. Thus, the statute provides for the early retirement of State police officers,[12] and other law enforcement personnel and those employed in positions involving potential danger to the safety of the public[13] are also

*the Justices, supra.* In *Gorman* v. *City of New York,* 280 App. Div. (N. Y.) 39 (1952), affd. 304 N. Y. 865 (1952), remittitur amended 304 N. Y. 973 (1953), app. dism. for want of a Federal question, 345 U. S. 962 (1953), an attack on New York legislation as violating due process and impairing the obligation of contract, the court stated: "The contractual nature of membership in a pension system does not also freeze public employment into unchangeable status. That a member's benefits in a pension system may not constitutionally be impaired does not also give him a constitutional right to stay in public employment." 280 App. Div. (N. Y.) at 45 (1952).

[11] Although the amendment to c. 221, § 72, does not refer to the retirement statutes, G. L. c. 32, § 1 and § 3 (2) (g), examination thereof is necessitated by the plaintiffs' attack.

[12] But cf. *Murgia* v. *Commonwealth of Mass. Bd. of Retirement,* 376 F. Supp. 753 (D. Mass. 1974), where a three-judge court struck down a provision requiring mandatory retirement of certain State police officers at age fifty. In the *Murgia* case, the court found the age selected to be arbitrary, but in so doing, it did not preclude legislative classification on the basis of public safety, as long as the lines drawn are reasonable.

[13] I.e., fire control and crash crewmen at Logan airport, steam engineers, boiler operators, certain ambulance attendants, and so forth.

classified in groups having an earlier retirement age than that of general officials and employees. We find this classification to be clearly rational. Available medical studies show that, as men approach and pass age sixty, sudden incapacitation due to strokes and heart attacks becomes more frequent and is unlikely to be predicted even with frequent medical examination. *Air Line Pilots Assn. Intl.* v. *Quesada,* 276 F. 2d 892 (2d Cir. 1960), cert. den. 366 U. S. 962 (1961). See the *Murgia* case, 376 F. Supp. at 755-756. The sudden incapacitation of a government employee who is directly responsible for the safety of others presents a far greater danger to the public than that of an employee sitting behind a desk or doing general labor. Court officers, in their attendance on sessions of the court, may be called upon to protect the court and the public. Additionally, as deputy sheriffs, many court officers are responsible for the custody of prisoners in the criminal sessions. In light of these functions, we cannot agree that a mandatory retirement age for court officers which is lower than that for government employees generally is not reasonably related to public safety. Accordingly, we hold that the classification within Group 1 is reasonably related to a valid State interest and does not violate the plaintiffs' rights to equal protection of the laws.

A judgment shall enter in each suit declaring that St. 1972, c. 740, § 10, is constitutional.

*So ordered.*

BRAUCHER, J.    (dissenting in part). I agree with most of what is said in the opinion of the court, but I do not think the 1972 statute was intended to apply to court officers who before August 16, 1972, had attained age sixty-five while classified in Group 1. As applied to such employees the result reached by the court treats court officers more harshly than others whose classification is changed. Although the Legislature has power to direct that result, I do not believe it intended to exercise that power.

Statute 1972, c. 740, § 10, amending G. L. c. 221, § 72,

was approved on July 17, 1972, and took effect on August 16, 1972. The amendment was part of the legislation establishing the Appeals Court, and its primary purpose was the insertion of references to that court. Late in the enactment process, however, § 10 was modified to provide that court officers attending this court, the Appeals Court or the Superior Court in any county "shall hold office during good behavior *but not beyond age sixty-five*" (emphasis supplied).[1] The italicized language first appeared in a committee report made on July 5, 1972,[2] and the Legislature was prorogued on July 9, 1972.[3] Legislative materials show nothing relevant except the change in statutory text.

Before the 1972 amendment to § 72, the court officers who had attained age sixty-five were classified as members of Group 1, established by G. L. c. 32, § 3 (2) (g), as amended. A member of Group 1 is required to retire on the last day of the month in which he attains age seventy; a member of Group 2 is required to retire on the last day of the month in which he attains age sixty-five.[4] But "no member who attains age sixty-five while classified in *Group 1* may thereafter be classified in *Group 2,* irrespective of change of employment."[5] No such provision is contained in the definition of Group 4, designed for police, firemen, and like employees.[6]

Court officers are subject both to G. L. c. 221, § 72, and to G. L. c. 32, §§ 1-28. *Burnside* v. *Bristol County Bd. of Retirement,* 352 Mass. 481, 485 (1967). On previous occasions, when classifications were changed, the Legislature

---

[1] 1972 Sen. Doc. No. 1277, p. 12.

[2] 1972 House Journal, p. 2249.

[3] 1972 Senate Journal, pp. 1970-1971.

[4] G. L. c. 32, § 1, defining "Maximum Age," as appearing in St. 1967, c. 826, § 1. G. L. c. 32, § 3 (2) (e) and (f), both as amended.

[5] G. L. c. 32, § 3 (2) (g), Group 2, as amended through St. 1972, c. 284, § 1.

[6] See St. 1967, c. 826, § 3; 1967 House Doc. No. 5316, p. 17.

showed itself sensitive to the harsh effects abrupt change can have on employees many of whom have rendered twenty or thirty years of faithful service. E.g., G. L. c. 32, § 5 (1) (a) and (c). St. 1969, c. 110, § 2. Here, however, in the traditional confusion of the days of prorogation, the Legislature enacted a badly drafted amendment which simply did not fit the retirement system. Our task in this situation, in my view, is to reconcile the conflicting statutes in such a way as to produce a harmonious whole, so far as that can be done without departing from clearly expressed legislative commands. Cf. *Chief of Police of Dracut* v. *Dracut*, 357 Mass. 492, 499 (1970).

I would read the 1972 amendment to G. L. c. 221, § 72, as transferring court officers from Group 1 to Group 2, subject to all the provisions of our statutes governing such transfers. On this reading, those who had attained age sixty-five while classified in Group 1 would not be classified in Group 2. They would remain subject to involuntary retirement at age seventy. Contrast *Kingston* v. *McLaughlin,* 359 F. Supp. 25, 27 (D. Mass. 1972), affd. 411 U. S. 923 (1973), where the plaintiffs, if not subject to the amendment, would not have been subject to involuntary retirement at all. Since all but six of the present plaintiffs attained age sixty-five while classified in Group 1, they would on my reading remain in Group 1 and would be subject to involuntary retirement at age seventy rather than at age sixty-five.